UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PATRICK GRIFFIN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Civil Action No. 17-cv-11619-IT |
| | * |
| THOMAS E. COGHILL, JR., THOMAS | * |
| E. COGHILL, SR., NANCY COGHILL, | * |
| XTREME FAT BIKES AND | * |
| COMPONENTS, LLC, and THE | * |
| TRUSTEE OF THE XTREME FAT TIRE | * |
| BIKE IRREVOCABLE TRUST, | * |
| | * |
| Defendants. | * |

MEMORANDUM AND ORDER

March 1, 2018

**TALWANI, D.J.**

Plaintiff Patrick Griffin ("Griffin") brings this action against Defendants Thomas E. Coghill Jr. ("Junior"), his parents Thomas E. Coghill Sr. ("Senior") and Nancy Coghill ("Mrs. Coghill") (together, the "Senior Coghills"), Xtreme Fat Bikes and Components, LLC ("Xtreme"), and The Trustee of the Xtreme Fat Tire Bike Irrevocable Trust ("the Trust"). Griffin asserts against all Defendants state law claims of fraud and deceit, fraud in the inducement, negligent misrepresentation, promissory estoppel, breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, and money had and received in connection with a purported fat tire bike business. Compl. [#1].

The Senior Coghills have moved to dismiss for lack of personal jurisdiction. Mot. to Dismiss [#18]. Griffin counters that this court has personal jurisdiction over the Senior Coghills because Junior acted as their agent, and in any event, the Senior Coghills themselves had

sufficient minimum contacts. Mem. Law Supp. Pl.'s Opp'n Mot. to Dismiss Filed By Thomas E. Coghill, Sr. & Nancy Coghill ("Pl.'s Opp'n Re Senior Coghills' Mot.") [#33]. For the reasons that follow, the Senior Coghills' motion is ALLOWED.

Junior and Xtreme have moved to dismiss the complaint on the ground that all counts against them are barred by the forum-selection clause in a 2016 Purchase and Sale Agreement, requiring suit to be brought in Broward County, Florida. Mot. to Dismiss the Pl.'s Compl. [#13]. They argue further that any non-contract claims are also barred by a mutual general release agreement in an amendment to the 2016 Purchase and Sale Agreement, signed that same day. Id. Griffin contends in response that the 2016 agreement and amendment are voidable as procured by fraud. Mem. Law Supp. Pl.'s Opp'n Mot. to Dismiss Filed By Thomas E. Coghill, Jr. & Xtreme Fat Tire Bikes & Components, LLC ("Pl.'s Opp'n Re Junior & Xtreme's Mot.") [#27]. For the reasons that follow, Junior and Xtreme's motion is DENIED.

I. Factual Background[1]

In approximately November 2014, Griffin made a telephone call from Massachusetts to a Florida-based fat tire bike company. Compl. ¶ 9 [#1]. Junior, an employee of the company, answered Griffin's call. Id. ¶ 10. After Griffin explained that he wanted to learn more about fat tire bikes so that he could rent them out of his shop, Junior told Griffin that in several months, Junior planned to start his own fat tire bike company. Id. ¶¶ 11-12. Junior further stated that his company would sell "much better" bikes than those about which Griffin had called. Id. ¶ 12. Griffin expressed an interest in further discussions. Id. ¶ 13.

---

[1] The facts relevant to Junior and Xtreme's motion to dismiss are based on the Complaint and properly incorporated documents. See Section IV. The additional facts relevant to the Senior Coghills are set forth under the standards used for a motion to dismiss for lack of personal jurisdiction. See Section II.

2

Shortly thereafter, Junior emailed Griffin several pictures of the fat tire bikes he hoped to sell, and directed Griffin to view the fat tire bikes Junior offered for sale on Indiegogo.com. Id. ¶¶ 14-15. Over the next month, Junior and Griffin continued their business discussions, eventually agreeing that Griffin would serve as the exclusive distributor of Xtreme Fat Tire Bikes in the northeastern United States. Id. ¶¶ 16-17. In exchange, Griffin was to wire $25,000 from Massachusetts to a Florida bank account in the name of Defendant Xtreme, an LLC based in Florida. Id. ¶ 18. Junior and the Senior Coghills were signatories on that bank account. Id. ¶ 19.

In December 2014, Xtreme's Operating Agreement was amended to reflect that Griffin took a 25% interest in Xtreme. Id. ¶ 101. Senior and Mrs. Coghill signed as "former members" of Xtreme. Pl.'s Opp'n Re Senior Coghills' Mot., Ex. 6, Am. Operating Agreement of Xtreme Fat Bikes & Components, LLC ("2014 Am. Operating Agreement") [#33-6] at 2. Senior also signed as Trustee for the Trust. Id.

Between January 29, 2015, and February 26, 2015, Griffin wired $16,000 from his Massachusetts bank account to the Xtreme bank account. Compl. ¶¶ 20-22 [#1].

In approximately March 2015, Griffin and his wife traveled to Florida. Id. ¶ 23. While there, Griffin arranged to and did meet with Junior at the Senior Coghills' home. Id. ¶ 26. Junior showed Griffin and his wife the inventory of two fat tire bikes in the Senior Coghills' garage and asked Griffin to assume a larger role in the business. Id. ¶¶ 26-27. Griffin and his wife then rode the fat tire bikes to and along Deerfield Beach, where they were stopped numerous times by people interested to learn more about the bikes. Id. ¶¶ 28-29. Based on that bike ride and the interest generated, Griffin decided to continue discussing with Junior as to whether Griffin would assume a larger role in the business. Id. ¶ 30.

On March 17, 2015, the Senior Coghills and Griffin entered into a Membership Purchase and Sale Agreement. Pl.'s Opp'n Re Senior Coghills' Mot., Ex. 7, Membership Interest Purchase & Sale Agreement [#33-7]. Under this agreement, the Senior Coghills transferred their interest in Xtreme to the Trust and Griffin, in exchange for approximately $2,500 from Griffin. Id. §§ 1-2.

Later that month, Griffin purchased airline tickets for Junior to fly from Florida to Massachusetts to meet with Griffin and his wife a second time. Compl. ¶ 31 [#1]. Junior then flew up to Boston, staying with Griffin while the two engaged in further business discussions. Id. ¶¶ 32-33. During that visit, Junior asked Griffin to become his business partner and to help grow Xtreme, and Griffin agreed to do so. Id. ¶¶ 34-35. In these discussions, Junior represented that Griffin would also be business partners with the Senior Coghills. Aff. Patrick Griffin Supp. Mem. Law Supp. Pl.'s Opp'n Mot. Dismiss Filed By Thomas E. Coghill, Jr. & Xtreme Fat Tire Bikes & Components, LLC ("Pl.'s Aff. Supp. Opp'n Re Senior Coghills' Mot.") ¶¶ 19-21 [#33-10]. One condition of the partnership, set at Junior's insistence, was that Griffin not be given access to or control over any Xtreme bank accounts. Compl. ¶ 36 [#1].

Griffin subsequently leased commercial space in One International Place in Boston, Massachusetts and began working to grow the business. Id. ¶ 37. Griffin also paid Junior an additional $25,000. Id. ¶¶ 38-39. Throughout April 2015, Griffin and Junior operated the business and continued their business discussions. Id. ¶ 40.

On April 8, 2015, Junior, on behalf of Xtreme, added Griffin and the Trust, and removed the Senior Coghills, as members in Xtreme. Pl.'s Opp'n Re Senior Coghills' Mot., Ex. 11, Articles of Am. to Articles of Org. of Xtreme Fat Bikes & Components, LLC [#33-11].

Junior subsequently represented to Griffin that Xtreme had approximately three hundred outstanding orders that could not be fulfilled due to cash-flow difficulties. Compl. ¶¶ 41-42 [#1].

In reliance on this representation, Griffin wired $73,500 to the Xtreme bank account so that Junior could wire the funds to a company in Korea that manufactured the fat tire bikes they planned to sell. Id. ¶¶ 42-43. Griffin and Junior agreed that Griffin would recoup his $73,500 payment by November 2015, and that Griffin would become a 25% owner in the business in lieu of charging interest on the $73,500 loan. Id. ¶ 44.

Although Junior represented to Griffin that he wired the $73,500 to the Korean manufacturing company, Junior did not wire the funds, instead sending the money to his own personal bank account in Florida. Id. ¶¶ 46-48. Junior and the Senior Coghills also withdrew money from the Xtreme bank account. Id. ¶¶ 49-50.

Junior continued representing to Griffin that the company was doing well and receiving numerous new orders, eventually requesting that Griffin wire an additional $90,000 to fulfill these new orders. Id. ¶¶ 51-52. Griffin then wired $90,000 from his Massachusetts bank account to the Xtreme bank account in July 2015. Id. ¶ 53. Although Junior represented that he wired the $90,000 to the Korean manufacturer, he did not do so, instead wiring a substantial amount of cash from the Xtreme bank account to his personal account. Id. ¶¶ 54-56. Junior and the Senior Coghills again withdrew money from the Xtreme bank account. Id. ¶¶ 57-58.

Junior again represented to Griffin that more money was required to fulfill new orders, and as a result, Griffin delivered to Junior $103,500 in silver bullion over the next several months, completing the deliveries in September 2015. Id. ¶¶ 59-60. Yet again, Junior stated that he wired $103,500 to the Korean manufacturer without doing so, wired cash from the Xtreme bank account into his personal bank account, and, with the Senior Coghills, withdrew money from the Xtreme bank account. Id. ¶¶ 61-65.

After Griffin delivered the silver bullion to Junior, Junior stopped responding to Griffin's phone calls, texts, and emails. Id. ¶ 66. When the Senior Coghills returned Griffin's phone calls, they explained that Junior was away and that during that time, they were running Xtreme's day-to-day operations under full authority of the partnership. Pl.'s Aff. Supp. Opp'n Re Senior Coghills' Mot. ¶ 68 [#33-10].

In April 2016, after speaking with Junior, Griffin and Junior executed a Purchase and Sale Agreement, under which Junior would purchase Griffin's 25% interest in Xtreme in exchange for $200,000. Compl. ¶ 67 [#1]. The 2016 Purchase and Sale Agreement provided that Junior was to pay Griffin $1,000 per month beginning in April 2016. Id. ¶ 68.

The 2016 Purchase and Sale Agreement referenced in the Complaint contains a forum selection clause stating: "The parties agree that any legal proceedings brought by either party in connection with, or arising out of, this Agreement shall be brought in Broward County, Florida." Mem. Law Supp. Defs.' Mot. Dismiss Pl.'s Compl., Ex. A, Membership Interest Purchase & Sale Agreement ¶ 12 [#14-1].

An Amendment to the 2016 Purchase and Sale Agreement provided for a release of all claims. See id. Ex. B, Am. Membership Interest Purchase & Sale Agreement [#14-2].[2] That Amendment contains a mutual release clause stating:

> For and in consideration of the matters set forth herein, [Patrick Griffin] and [Coghill] on behalf of themselves and each of their respective successors and assigns, do hereby mutually remise, release and forever discharge each other of and from any and all manner of actions, causes of action, suits[,] controversies, agreement, promises, claims, rights, damages and demands whatsoever, in lay or equity, whether presently known or unknown, whether material, immaterial, contingent, potential or direct and whether sounding in tort, in contract or otherwise, together with any other rights, claims, causes of action, damages, costs, attorneys' fees, expenses and compensation of any nature whatsoever, whether known or unknown, including any claim for declaratory or

---

[2] This document is not referenced in the complaint, but the parties presented identical copies of it, it is dated the same day as the 2016 Purchase and Sale Agreement, and it appears to be part of the same transaction. Plaintiff has not objected to the court's consideration of this document in connection with Junior and Xtreme's motion to dismiss.

6

injunctive relief and any cause or thing whatsoever from the beginning of the world to the day of execution of this Agreement by the last party to do so.

Defs.' Mot. to Dismiss, Ex. C ¶ 2 [#14-2].

Junior made no payments pursuant to the 2016 Purchase and Sale Agreement. Compl. ¶ 69 [#1]. Griffin received one check after signing this agreement from Mrs. Coghill's personal account. Pl.'s Aff. Supp. Opp'n Re Senior Coghills' Mot. ¶ 74 [#33-10].[3]

The Senior Coghills are residents of Florida. Aff. of Mrs. Coghill in Supp. of Defs.' Mot. to Dismiss ¶ 1 ("Mrs. Coghill Aff.") [#20]; Aff. of Senior in Supp. of Defs.' Mot. to Dismiss ¶ 1 ("Senior Aff.") [#21]. They have never lived or owned any property in Massachusetts, travelled to Massachusetts for business, or maintained an office, post office mailbox, or bank account in Massachusetts. Mrs. Coghill Aff. ¶ 3 [#20]; Senior Aff. ¶ 2 [#21]. They have travelled only once to Massachusetts, when they vacationed briefly in Cape Cod at some point in the late 1960s or early 1970s. Mrs. Coghill Aff. ¶ 4 [#20]; Senior Aff. ¶ 3 [#21].

II. The Senior Coghill's Motion to Dismiss

   A. *Standard*

When a district court considers a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, its determination is governed by the prima facie standard. United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). Under the prima facie standard, the plaintiff must "proffer[] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016). Griffin bears the burden of persuasion. See id. ("A Corp.

---

[3] The parties have attempted to introduce additional documents and facts in connection with Junior and Xtreme's motion to dismiss. These matters are not properly before the court. The court previously denied Defendants' Motion for Leave to File a Post-Argument Memorandum [#48] with attached exhibit, Elec. Order [#49], and now *sua sponte* strikes exhibits 1 – 10 and 12 – 13 to Griffin's Opposition to the Motion to Dismiss [#27].

bears the burden to establish that specific jurisdiction exits over All American."). The court "must accept the plaintiff's (properly documented) evidentiary proffers as true" and "construe them in the light most congenial to the plaintiff's jurisdictional claim." Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007) (internal citations omitted). The facts put forward by the defendant become "part of the mix only to the extent that they are uncontradicted." Id.

Where the Massachusetts long-arm statute applies, a court "may proceed directly to the Constitutional analysis because the long-arm statute is 'coextensive with the limits allowed by the United States Constitution.'" Grice v. WIM Holdings Grp., LLC, No. 17-10944-WGY, 2017 WL 6210891, at *4 (D. Mass. Dec. 8, 2017) (quoting Hannon v. Beard, 524 F.3d 275, 280 (1st Cir. 2008)); see also Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 4 (1st Cir. 2016).

A court may exercise personal jurisdiction over an out-of-state defendant in conformity with the Due Process Clause "only if that defendant has 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Copia Commc'ns, 812 F.3d at 4 (quoting Int'l Shoe Co. v. Washington, 236 U.S. 310, 316 (1945)). "Personal jurisdiction may be either general or specific." Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 31 (1st Cir. 2010). General jurisdiction exists where a defendant undertakes "continuous and systematic activity" in the forum state, regardless of whether that activity relates to the instant action. Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994). A court has specific jurisdiction if the cause of action arises out of or relates to a defendant's contacts with the forum state. Id. Here, Griffin does not contend that this court has general jurisdiction over the Senior Coghills, but contends that the court has specific jurisdiction over them.

*B. Analysis*

To determine whether this court has specific jurisdiction over the Senior Coghills, the court considers first whether Junior acted as the Senior Coghills' agent, such that his actions may be imputed to them. See Jet Wine & Spirits, Inc. v. Baccardi & Co., 298 F.3d 1, 7-8 (1st Cir. 2002) (plaintiff may prove personal jurisdiction exists by ascribing to defendant any in-forum contacts undertaken by its agents). When considering whether to impute to a defendant the actions of its alleged agent, "the question . . . is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., et. al., 290 F.3d 42, 56-57 (1st Cir. 2002).

"An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf [of] and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1119 (Mass. 2000). However, to hold the principal liable for the acts of the agent, the agent must have actual or apparent authority. Id. "Actual authority . . . is the agent's power to affect the principal's relations with third parties as manifested to the agent by the principal." Id. at 1120. An agent has express actual authority where "the principal explicitly manifests consent, either through words or conduct, that the agent should act on behalf of the principal," whereas an agent's implied actual authority "evolves by implication from the conduct of the parties." Id. at 1120 n.13.

Griffin has not demonstrated that Junior had actual authority to act on the Senior Coghills' behalf. There are no facts showing that they expressly authorized Junior to act on their behalf, nor is there any conduct by the Senior Coghills that, over time, implied that such authorization was given. Griffin points to the fact that the Senior Coghills opened bank accounts

9

with Junior and submitted official documents to the State of Florida Corporations Division regarding Xtreme. However, at best these facts show that the Senior Coghills were associated with Xtreme, not that they authorized Junior to act as their agent in Massachusetts.

Griffin argues that Junior in any event had apparent authority to act on the Senior Coghill's behalf. "Apparent authority[] is 'created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.'" Id. at 1120. Apparent authority is judged by the words or conduct of the principal, not the putative agent. CNE Direct, Inc. v. Blackberry Corp., No. 14-10-149-FDS, 2015 WL 4750847, at *8 (D. Mass. Aug. 10, 2015), aff'd 821 F.3d 146 (1st Cir. 2016). Thus, "[a]pparent authority exists only if the plaintiff reasonably relied on the principal's words or conduct at the time he entered the transaction that the agent is authorized to act on the principal's behalf." Theos & Sons, Inc., 729 N.E.2d at 1121.

Here, the facts presented to the court indicate only that Junior represented to Griffin that he was acting on their behalf; there are no facts showing that the Senior Coghills said or did anything to support those representations. Griffin asserts that the Senior Coghills told him sometime in 2016 that they were responsible for Xtreme's day-to-day operations while Junior was away, and that they were acting under full authority of the partnership. However, these alleged statements relate only to the authority conferred by Junior on the Senior Coghills, and are unrelated to whether the Senior Coghills conferred any authority on Junior.

Moreover, the Senior Coghills did not, as Griffin argues, ratify Junior's conduct. In Massachusetts, "ratification of an agent's acts may be express or implied and, as a general proposition, the principal must have full knowledge of all material facts." Inn Foods, Inc. v.

10

Equitable Co-op. Bank, 45 F.3d 594, 597 (1st Cir. 1995). Ratification may also exist where the principal "purposely shut[s] his eyes to means of information within his own possession and control." Id. (internal citations omitted). Griffin argues that while the Senior Coghills may not have known every detail of Junior's interactions with Griffin, they knew that Junior was a convicted fraudster and his previous conditions of supervision precluded him from participating in the formation of or membership in LLCs and partnerships. This allegation is simply besides the point: that they may have had reason to suspect that their son was engaging in fraudulent activity does not show that they had any knowledge as to the nature of the dealings between Griffin and Junior. Further, Griffin argues, the following conduct indicates ratification: (1) receiving cash sent by Griffin, (2) communicating directly with him about the business, and (3) submitting official documents to the State of Florida Corporations Division regarding Xtreme. Again, there is no evidence that the Senior Coghills knew about Junior's representations about the authority they purportedly vested in him. And, as noted earlier, none of the conduct to which Griffin points bears on what Junior was or was not authorized to do on the Senior Coghills' behalf. Nor are there facts showing that the money withdrawn from the Xtreme bank account was done with any knowledge by either Senior or Mrs. Coghill of the purported fraud used to obtain the money.

Accordingly, there is no evidence upon which to base the conclusion that Junior was the Senior Coghills' agent, and thus his actions cannot be imputed to them.

Having failed to establish that Junior acted as the Senior Coghills' agent, Griffin is left to argue that the Senior Coghills' contacts are sufficient to establish this court's specific jurisdiction over them. "The First Circuit employs a tripartite analysis to determine whether specific jurisdiction is appropriate: 1) whether the claims arise out of or are related to the defendant's in-

state activities, 2) whether the defendant has purposefully availed itself of the laws of the forum state and 3) whether the exercise of jurisdiction is reasonable under the circumstances." Pesmel N. Am., LLC v. Caraustar Indus., Inc., 754 F. Supp. 2d 168, 172 (D. Mass. 2010).

Much of the alleged conduct to which Griffin points – most notably the withdrawals from the Xtreme bank account – even if true, took place in Florida and cannot support this court's jurisdiction. However, Griffin also alleges that the following contacts took place in Massachusetts: (1) Griffin was in Massachusetts when he spoke with the Senior Coghills over the phone to discuss Xtreme business, (2) they returned a phone call to him in Massachusetts, and (3) they signed and mailed to Massachusetts the Membership Purchase and Sale Agreement in 2015 and a check from Mrs. Coghill's personal account in 2016. The court does not find that these activities are properly considered in-state activities. But even if the court could so characterize them, Griffin's argument fails with respect to purposeful availment.

To show purposeful availment, a plaintiff must show an act or series of acts "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). "The court must look to the parties' negotiations and the expected consequences, the terms of their contract, and their actual course of dealing to determine whether the defendant's contacts with the forum made it foreseeable that the defendant might have to face litigation in the forum state." Shelton Bros., Inc. v. Three Pirates, Inc., No. 15-30140-MGM, 2017 WL 1227922, at *5 (D. Mass. Mar. 31, 2017) (citing Adams v. Adams, 601 F.3d 1, 7 (1st Cir. 2010)). At best, Griffin's allegations indicate that the Senior Coghills initiated one phone call and sent two pieces of mail to Griffin in Massachusetts. These three actions, without more, would not have made it foreseeable to the Senior Coghills that they may face litigation in Massachusetts for Junior's

allegedly fraudulent scheme, where no evidence indicates they were aware of it. See, e.g., Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 36-37 (1st Cir. 1998) (holding one phone call and subsequent mailing insufficient to establish purposeful availment). As a result, Griffin has failed to show that this court has jurisdiction over the Senior Coghills, and their Motion to Dismiss [#18] is ALLOWED.

    III.    Junior and Xtreme's Motion to Dismiss

        *A. Standard*

A motion dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) is properly allowed when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007)). For the purposes of this motion, any well-pleaded, non-conclusory factual allegations are assumed true and all reasonable inferences are drawn in the plaintiff's favor. See Iqbal, 556 U.S. at 680-81 (stating that conclusory allegations are not entitled to a presumption of truth); Twombly, 550 U.S. at 581. The court will then "determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable." Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015)).

In deciding such motion, a court is ordinarily limited to considering "only the complaint, documents attached to it, and documents expressly incorporated into it." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 72 (1st Cir. 2014). When, however, "a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can

review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998).

   B. *Analysis*

Junior and Xtreme argue that this suit must be dismissed based on the forum selection clause in the 2016 agreement and the mutual release in the amendment thereto. Plaintiff responds that the 2016 agreement and mutual release were procured by fraud, and are thus voidable.

A party who has been fraudulently induced by the defendant into entering a contract can rescind that contract. See Shaw's Supermarkets, Inc. v. Delgiacco, 575 N.E.2d 1115, 1117 (Mass. 1991). A contract induced by fraudulent misrepresentation is voidable. Id. To show fraud in the inducement, a plaintiff must show "1) that the defendant made a false representation of material fact, 2) with knowledge of its falsity, 3) with the purpose of inducing the plaintiff to act thereon and 4) that the plaintiff relied upon the representation to his detriment." Berwind Prop. Grp. Inc. v. Envtl. Mgmt. Grp., Inc., No. 04-11411-NMG, 2007 WL 4707647, at *3 (D. Mass. Feb. 5, 2007) (citing Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 85 (D. Mass. 1998)); see also Metro. Life Ins. Co. v. Ditmore, 729 F.2d 1, 4 (1st Cir. 1984).

Griffin alleges that Junior misrepresented the health of the business, specifically with respect to the number of orders received, and knew at the time he made these misrepresentations that they were false. Griffin further alleges that Junior made these misrepresentations to induce Griffin to wire him money, and that in reliance on those misrepresentations, Griffin did wire almost $300,000 over the course of several months. Moreover, Griffin states that he entered into the 2014 Operating Agreement in reliance on those misrepresentations, taking a 25% stake in Xtreme on the mistaken belief that it was thriving. Finally, Griffin represents that he entered into the 2016 Purchase and Sale Agreement and the amendment thereto on Junior's final set of

misrepresentations that he intended to and would pay Griffin $200,000. These allegations – if true – are sufficient to support Griffin's argument that the 2016 Purchase and Sale Agreement and amendment thereto are voidable by reason of fraudulent inducement, and that Griffin therefore is not contractually limited to a Florida forum or bound by the mutual release.

Junior and Xtreme argue further that Griffin may not claim that the 2016 Purchase and Sale Agreement is voidable because Griffin has brought a breach of contract claim premised on that same contract. While Griffin's counsel's position as to whether he was suing on the 2016 Purchase and Sale Agreement was unclear at oral argument, the only contract as to which a breach of contract is claimed in the operative complaint is the 2014 Operating Agreement, which contains no forum selection clause. In sum, whether the 2016 Purchase and Sale Agreement and amendment thereto are void, and thus whether the forum selection clause in the 2016 Purchase and Sale Agreement and the mutual release in the amendment thereto are enforceable cannot be resolved on a motion to dismiss.

IV. Conclusion

For the foregoing reasons, Senior Coghills' Motion to Dismiss [#18] is ALLOWED and Junior and Xtreme's Motion to Dismiss [#13] is DENIED.

IT IS SO ORDERED.

Date: March 1, 2018 /s/ Indira Talwani
United States District Judge